UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**RICK BONDS**,

    Plaintiff/Counter-defendant,

vs.

No. 2:12-cv-10371
Hon. Gerald E. Rosen

**PHILIPS ELECTRONIC
NORTH AMERICA,**

    Defendant/Counter-plaintiff.
_____/

**OPINION AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S
<u>MOTION FOR SANCTIONS</u>**

**I. INTRODUCTION**

In the span of less than nine-months, Plaintiff Rick Bonds went from being employed as a long-time medical imaging equipment repairman by Defendant Philips Electronic North America (Philips),[1] to also working for one of Defendant's competitors, Barrington Medical Imaging, LLC (Barrington), to being fired by both. Nearly two and a half years later, Plaintiff commenced this instant litigation. His one-count Complaint asserts that after Defendant terminated Plaintiff's employment, its attorney communicated with Barrington regarding Plaintiff's obligations under confidentiality and non-disclosure agreements in a

---

[1] Though captioned as "Phillips," Defendant's papers make clear that the proper spelling is "Philips."

1

manner that resulted in Barrington terminating his employment. Consequently, Plaintiff claims that Defendant tortiously interfered with his business relationship in violation of Michigan law. Defendant has now moved for summary judgment, as well as for sanctions relating to Plaintiff's discovery conduct. Having reviewed and considered the parties' briefs and supporting documents, supplemental briefs,[2] and the entire record of this matter, the Court has determined that the pertinent allegations and legal arguments are sufficiently addressed in these materials and that oral argument would not assist in the resolution of these motions. Accordingly, the Court will decide Defendant's motions "on the briefs." *See* Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan. This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

**A.     Plaintiff's employment with Defendant**

Defendant hired Plaintiff in 1996[3] as a field service engineer to maintain and repair medical imaging equipment -- x-ray machines, CT scanners, etc. (Plf's

---

[2] Three months after filing its two motions, Defendant sought leave to file a Supplemental Reply Brief In Support of Motion for Sanctions, to which Plaintiff timely respond. (Def's Mtn., Dkt. # 57; Plf's Resp., Dkt. # 60). The Court GRANTS this Motion.

[3] Defendant's predecessor, Picker International, Inc. (Picker), originally hired Plaintiff. Picker then changed its name to Marconi Medical Systems (Marconi). In 2001, Royal Philips Electronics acquired Marconi and subsequently became known as Philips Medical Systems. Philips Medical Systems is a business unit in

Dep., Dkt. # 39, at 24-27). Plaintiff signed several documents concerning Defendant's confidential information upon hire, including a "Service Engineer Confidentiality Agreement" and an "Employee Invention and Confidential Information Agreement." (*Id.* at 218-22, Dep. Ex. M). Plaintiff worked for Defendant until July 2009, primarily serving lower Michigan and northwest Ohio. (Plf's Dep., Dkt. # 39, at 24-26). During this time period, Plaintiff had access to a variety of Defendant's confidential, sensitive, proprietary, and trade secret manuals and other information about Defendant's equipment. (*Id.* at 306-08; Ex. C to Def's Mtn., Dkt. # 41-4, at ¶ 4).

## B.     Plaintiff secures a second job with Barrington and Defendant fires Plaintiff

Plaintiff's employment with Defendant was uneventful until late 2008/early 2009, when Plaintiff obtained a second job with Barrington, unbeknownst to Defendant. Barrington sold and serviced medical imaging equipment, including, in some instances, Defendant's equipment. (Plf's Dep., Dkt. # 39, at 232, 247-48; Ex. D to Def's Mtn., Dkt. # 41-5, at ¶ 3). Beginning in December 2008, Barrington began recruiting Plaintiff for an open field service engineer position. (Plf's Dep., Dkt. # 39, at 32-34). This led to several interviews, and ultimately

---

the Philips Electronics North America corporation. (Ex. B to Def's Def's Mtn., Dkt. # 41-3, at ¶ 6).

3

resulted in Plaintiff receiving an employment offer from Barrington in January 2009. (*Id.* at 33-34, 248).

As part of the terms of Plaintiff's employment with Barrington, Plaintiff agreed to the following non-competition clause:

> You hereby warrant that, in entering into this agreement with [Barrington], you are in no manner in violation of a previous contract with respect to a non-compete clause, nor that you are under any contract with another company, *with the exception of your current contract agreement with Philips Medical Systems*, person or entity, which might conflict with the [Barrington] Businesses.

(Ex. G to Plf's Dep., Dkt. # 39-7) (emphasis added).[4] Plaintiff did not inform Defendant that he had taken a full-time job with Barrington. (Plf's Dep., Dkt. # 37, at 282).

---

[4] There is significant dispute as to whether the terms of Plaintiff's employment with Barrington contained *this* non-competition clause. According to affidavits submitted from Barrington, a January 12, 2009 offer letter from Barrington -- which Plaintiff signed and returned to Barrington on January 13, 2009 -- governed Plaintiff's terms of employment. (Ex. D to Def's Mtn., Dkt. # 41-5, at ¶ 6 (and accompanying exhibits)). While this letter also contains a nearly identical non-competition clause, it omits the reference to Defendant:

> You hereby warrant that, in entering into this agreement with [Barrington], you are in no manner in violation of a previous contract with respect to a non-compete clause, nor that you are under any contract with another company, person or entity, which might conflict with the [Barrington] Businesses.

(*Id.*). Moreover, Barrington asserts that Plaintiff informed Barrington that he had resigned from Defendant, that it was not aware that Plaintiff kept his job with Defendant while at Barrington, and that Barrington "would not have permitted"

Plaintiff maintained his dual-employment until July 2009. At that time, Defendant learned from one of its customers of Plaintiff's employment with Barrington. (Ex. B to Def's Mtn., Dkt. # 41-3, at ¶ 7). Defendant then terminated Plaintiff's employment on July 16, 2009 for violating Defendant's employment policies and the terms of Plaintiff's non-competition agreement. (Plf's Dep., Dkt. # 39, at 36, 280; Ex. B. to Def's Mtn., Dkt. # 41-3, at ¶¶ 7-10). Importantly, Plaintiff does not assert any claims against Defendant for its termination of his employment in this case and even concedes that he believed some amount of discipline was appropriate for his actions. (Plf's Dep., Dkt. # 39, at 281). It is, rather, what happened next that forms the basis of this lawsuit.

---

Plaintiff to be employed both by Defendant *and* Barrington. (*Id.* at ¶ 10; Ex. E to Def's Mtn., Dkt. # 41-6, at ¶ 10).

Plaintiff has put forth evidence to the contrary. He does not dispute that he executed the January 12, 2009 letter. Instead, Plaintiff claims that this was an accident, that he told Barrington about his employment with Defendant, and that a subsequent version of the employment agreement codified this understanding (as well as an additional change not relevant here.) (Plf's Dep., Dkt. # 39, at 260-66, 275). The stark differences between these two accounts are troubling as they drip of claims of manufactured evidence. *See also* Def's Supp. Reply Brief, Dkt. # 57-2. Such differences, however, do not create a genuine issue of fact in this regard because the Court assumes Plaintiff's version of the events for the purposes of this Motion. Lastly, it is worth noting that before commencing this litigation, Plaintiff filed a claim for unemployment compensation against Barrington, which Barrington disputed. During the unemployment hearing, Plaintiff testified that these changes Plaintiff requested were "never" reduced to writing. (Ex. D to Plf's Dep., Dkt. # 39-5, at 15).

5

**C.     Defendant's alleged act of interference**

A month after Defendant terminated Plaintiff's employment, on August 19, 2009, Gerald Whitcomb, Defendant's Senior Counsel, sent a letter to Plaintiff and copied Barrington via fax. The whole text of the letter, titled "your ongoing duty of confidentiality to Philips," is set forth below:

> I am writing to remind you of your continuing obligation to Philips Healthcare, ("Philips") pursuant to the agreements you signed. As successor in interest to Picker, Philips is entitled to enforce these agreements against you, if necessary. A copy of the Service Engineer Confidentiality Agreement and the Employee Invention and Confidential Information Agreement are enclosed for your reference. Under these Agreements, you are precluded from disclosing Philips (sic) confidential information, including but not limited to customer and pricing information.
>
> We understand that you have been and are now employed by Barrington Medical. As you were employed by both companies simultaneously, from January until July of this year, we are naturally concerned about the potential disclosure of Philips (sic) confidential information. Please confirm in writing that you have not furnished Barrington with any such information. By copy of this letter, we are also asking Barrington Medical to confirm in writing that: 1) you have not provided Philips (sic) confidential information to Barrington Medical; and 2) that if you have, it will be returned immediately. Please send the confirmations to my attention.
>
> Your conduct since your termination is equally concerning. We understand that you contacted Philips RTAC on August 17th and attempted to use your RTAC Pin to obtain Tier 2 support for Universal Imaging in Dearborn, Michigan. In attempting to use Philips (sic) resources in furtherance of your work at Barrington or otherwise, you are violating the above agreements.

(*Id.* at Ex. R).

6

Less than a week later, on August 24, 2009, Barrington terminated Plaintiff's employment. (Plf's Dep., Dkt. # 39, at 35; Ex. D to Def's Mtn., Dkt. # 41-5, at ¶ 11; Ex. E to Def's Mtn., Dkt. 41-6, at ¶ 11). No one from Defendant requested that Barrington terminate Plaintiff's employment. (Ex. D to Def's Mtn., Dkt. # 41-5, at ¶ 13; Ex. E to Def's Mtn., Dkt. # 41-6, at ¶ 14). According to Plaintiff, Barrington terminated his employment because "they were afraid that Philips was going to follow through with the lawsuit." (Plf's Dep., Dkt. # 39, at 36).[5] He knows this because Plaintiff's managers told him that "they were going to let [him] go because [he was] working two jobs and [Philips was] threatening [Barrington] with [a] lawsuit" and that Barrington could not "afford it." (*Id.* at 37, 294, 297-301).[6] Plaintiff also claims that he received a letter from his supervisor,

---

[5] Plaintiff testified in the unemployment hearing that he believed that Barrington discharged him "because they lost the major account" on which he was hired to work. (Ex. D to Plf's Dep., Dkt. #39-5, at 20). He made no mention of alleged "threats" by Defendant.

[6] Both Defendant and Barrington absolutely deny that anyone from Defendant made any kind of threat -- litigation or otherwise -- against Barrington as a result of Barrington's employment of Plaintiff. (Ex. B to Def's Mtn., Dkt. # 41-3, at ¶ 11; Ex. D to Def's Mtn., Dkt. # 41-5, at ¶ 14; Ex. E to Def's Mtn., Dkt. # 41-6, at ¶ 15; Ex. F to Def's Mtn., Dkt. # 41-7, at ¶ 10). Rather, Barrington claims that it terminated Plaintiff's employment because he violated the terms of his employment agreement and Barrington's policies by working for Defendant and Barrington at the same time. (Ex. D to Def's Mtn., Dkt. # 41-5, at ¶ 12; Ex. E to Def's Mtn., Dkt. # 41-6, at ¶ 12). Similar to the facts surrounding Plaintiff's terms of employment with Barrington as set forth in footnote 4, this factual discrepancy does not create an issue of fact because Plaintiff's claim fails even accepting Plaintiff's version of the events.

Barrington's Vice President of Service Operations, Michael Mercer, dated August 25, 2009, stating:

> I'm sorry that your employment with Barrington didn't work out as agreed. I hope you understand that the threat of a lawsuit that Philips may place upon us is too costly if we were to keep you employed. I wish it had worked out differently. You will soon receive information on any reimbursements, expenses, and your last paycheck in weeks to follow.

(*Id.* at 301-03, Dep. Ex. S.).[7]

Plaintiff filed his one-count Complaint on January 27, 2012. (Compl., Dkt. # 1). As noted above, Plaintiff does not assert a claim arising out of his termination from Defendant. Nor does Plaintiff make a claim against Barrington. He only brings one count against Defendant: tortious interference with a business relationship. Defendant also asserts four counterclaims against Plaintiff -- breach of two contracts, unfair competition, and misappropriation of trade secrets -- on which the parties have not filed dispositive motions. (Answer & Countercl., Dkt. # 16). After an apparently contentious discovery process, Defendant has now moved

---

[7] Notwithstanding this assertion, Plaintiff also received a letter from one of Barrington's owners dated September 8, 2009, stating that Barrington terminated his employment "for cause" and offering severance benefits. (Plf's Dep., Dkt. # 39, at 289-91, 298-99; Ex. E to Def's Mtn., Dkt. # 41-6, at Ex. 3). This September 8 letter does not reference Mercer's August 25, 2009 letter. Instead, it mentions a September 2, 2009 letter that Plaintiff admits he received from Barb Byrnes that included a "typical termination packet," like "insurance stuff." (Plf's Dep., Dkt. # 39, at 290, 298). Finally, as referenced in footnote 6, Mercer attested that Barrington decided to terminate Plaintiff because he was working for two companies at once "and not because of any threat from Philips." (Ex. D to Def's Mtn., Dkt. # 41-5, at ¶ 12).

for summary judgment, as well as for sanctions relating to Plaintiff's discovery conduct. For the reasons set forth below, the Court GRANTS Defendant's Motion for Summary Judgment and DENIES Defendant's Motion for Sanctions.

### III. DISCUSSION

**A.    Rule 56 Standard**

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In addition, where a moving party -- here, Defendant -- seeks an award of summary judgment in its favor on a claim or issue as to which it bears the burden of proof at trial, this party's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986) (internal quotation marks, citation, and emphasis omitted).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,*

9

434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed." Fed. R. Civ. P. 56(c)(1). But, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack*, 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

### B. Defendant did not tortiously interfere with Plaintiff's business relationship

To make out a claim for tortious interference with a business relationship, a plaintiff must prove the following elements: (1) the existence of a valid business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship; and (4) resultant damage to the plaintiff. *Cedroni Assoc., Inc. v. Tomblinson, Harburn Assoc., Architects & Planners, Inc.*, 492 Mich. 40, 45 (2012). Because Plaintiff cannot prove the third element, the Court only discusses this element.[8]

"To fulfill the third element, intentional interference inducing or causing a breach of a business relationship, a plaintiff must demonstrate that the defendant acted both intentionally and either improperly or without justification." *Dalley v.*

---

[8] Defendant does not dispute the first two elements, but does dispute that Plaintiff suffered damages.

10

*Dykema Gossett*, 287 Mich. App. 296, 323 (2010). A plaintiff may do so by either "proving (1) the intentional doing of an act wrongful per se, or (2) the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship." *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 257 Mich. App. 365, 383 (2003). "A wrongful act per se is an act that is inherently wrongful or an act that can never be justified under any circumstances." *Prysak v. R.L. Polk Co.*, 193 Mich. App. 1, 12-13 (1992). To find an act with malice and without justification, there must be "specific[], affirmative acts by the defendant that corroborate the improper motive of the interference." *Dalley*, 287 Mich. App. at 324 (citation omitted). Finally, "[w]here the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference." *Id.* (citation omitted).

Plaintiff has put forth no evidence that Defendant committed a per se wrongful act. Accordingly, this Court turns to whether Plaintiff can prove "the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship." *Advocacy Org.*, 257 Mich. App. at 383. Plaintiff cannot so prove for a multitude of reasons.

Initially, Plaintiff rests his claim on the central premise that Barrington told him -- orally and in writing -- that it fired him because Defendant threatened to sue

Barrington. As Defendant correctly asserts, albeit in an argument relegated to a footnote, Plaintiff may not rely on these hearsay -- and double hearsay -- statements. It is well-settled that courts must disregard hearsay used to counter a motion for summary judgment. *Alexander v. CareSource,* 576 F.3d 551, 558-59 (6th Cir. 2009); *Sperle v. Mich. Dept. of Corrections,* 297 F.3d 483, 495 (6th Cir. 2002) ("A party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact"); *United States v. Gibson,* 409 F.3d 325, 337 (6th Cir. 2005) ("[I]n order for double-hearsay statements to be admissible, both statements must be excluded from the hearsay definition."). Without these statements, Plaintiff has no evidence that Defendant maliciously and unjustifiably interfered with Plaintiff's employment with Barrington.[9]

---

[9] Though Rule 56 does not mandate that Plaintiff "produce evidence in a form that would be admissible at trial" in order to defeat a motion for summary judgment, *Celotex*, 477 U.S. at 324, it does require that he present evidence that is "capable of being converted into admissible evidence" at trial. *DeBiasi v. Charter Cnty. of Wayne*, 537 F. Supp. 2d 903, 911 (E.D. Mich. 2008) (citation omitted). Stated differently, "[t]he proffered evidence need not be in admissible form, but its content must be admissible." *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997) (emphasis omitted). "For instance, deposition testimony will assist a plaintiff in surviving a motion for summary judgment, even if the deposition itself is not admissible at trial, provided substituted oral testimony would be admissible and create a genuine issue of material fact." *Id.* Here, however, the content -- i.e., Plaintiff's *own* statements as to what Barrington's employees told him -- are hearsay and "live" testimony at trial from Barrington's employees cannot cure this evidentiary hurdle.

Even considering these statements, Plaintiff's claim still fails. Viewing the evidence in the light most favorable to Plaintiff, Barrington's alleged knowledge of Plaintiff's concurrent employment with Defendant undermines any causal link between Whitcomb's letter and Plaintiff's termination. According to Plaintiff, Barrington was not only aware of Plaintiff's employment with Defendant, it agreed to limit the terms of Plaintiff's non-competition clause by *expressly referencing Plaintiff's employment with Philips*. This Court cannot dismiss this material fact. It is simply not logical to conclude that Whitcomb's letter caused Barrington to become aware of the threat of litigation by one of its competitors so as to justify terminating Plaintiff's employment given Barrington's alleged knowledge of Plaintiff's employment with Defendant.

And, even if Whitcomb's letter *caused* Plaintiff's termination, he has not presented any specific, affirmative acts that corroborate an improper motive of interference. It is not enough for Plaintiff to point to Whitcomb's letter; he must show that Whitcomb sent it with the improper motive of seeking to interfere with Plaintiff's business relationship with Barrington. Instructive here is the Michigan Court of Appeals case of *Prysak*. In that case, the plaintiff worked for a publishing and research company. 193 Mich. App. at 4. Separately, the plaintiff and one of his employer's customers, a car dealership, were involved in a car repair dispute. *Id.* During the course of mediating the dispute, the plaintiff allegedly threatened to

distribute letters indicating that his car was a "lemon" to the dealership's customers. *Id.* The plaintiff was to accomplish this by using his employer's customer lists. *Id.* at 4-5. In response, the dealership wrote a letter to the employer regarding the alleged threat, and "expressed concern regarding the improper use of its customer lists and requested assurance from [the employer] that '[the plaintiff]'s stated plan does not come to fruition." *Id.* at 5. Plaintiff's employer terminated his employment after receiving this information. *Id.*

The Michigan Court of Appeals affirmed the trial court's determination that the dealership did not tortiously interfere with his contractual relationship with his employer:

> Plaintiff asserts on appeal that Crestwood's letter "unjustifiably" led to plaintiff's termination. However, plaintiff has not presented any facts to suggest that Crestwood's action in sending the letter was wrongful conduct per se or was lawful conduct that was done with malice and that sending the letter was an unjustified act done for the purpose of invading his contractual relationship with Polk.
>
> In light of the evidence presented, we hold that the trial court correctly determined that there was no genuine issue of material fact in regard to plaintiff's claim. *The letter itself is merely an expression of Crestwood's concern over the alleged threats made by plaintiff. The letter, while employing strong language, does not call for the discharge of plaintiff. Rather, Crestwood sought assurances that its customer lists would not be misused.* There is no indication that Crestwood was acting with a wrongful or malicious intent to interfere with plaintiff's employment. To the contrary, *Crestwood appears to have been acting solely to protect the confidentiality of its customer lists.*

14

*Id.* at 13-14 (emphasis added). Similarly, Whitcomb's letter also contains strong, assertive language, but does not call for Plaintiff's discharge and Plaintiff has no evidence that anyone from Defendant specifically requested his discharge. Whitcomb's letter raises concerns regarding Plaintiff's obligations under his confidentiality agreements, and more specifically, "the potential disclosure of Philips (sic) confidential information." These concerns are of course magnified by the fact that Defendant did not disclose his concurrent employment with Barrington to Defendant. Therefore, "[Philips] appears to have been acting solely to protect . . . [its] confidential information," and Plaintiff has put forth no evidence of an improper motive of interference. *Id.* at 14; *see also Hollings v. TransactTools, Inc.*, 128 F. App'x 820, 821-22 (2d Cir. 2005) (no tortious interference where former employer sent letter to plaintiff's new employer "expressing concerns" regarding the possibility of disclosure of former employer's "proprietary confidential and trade secret information" and requesting assurances from new employer that plaintiff not work on competitive products or solicit its employees, which caused the new employer to terminate the plaintiff's employment).[10]

---

[10] Plaintiff's Response also insinuates that one of Barrington's owners testified at the unemployment hearing that Whitcomb's letter and Plaintiff's employment "put [Barrington] at risk with Philips." (Plf's Resp., Dkt. #47, at 6). Upon review of this testimony, however, Plaintiff lifts the testimony completely out-of-context. Instead, the co-owner's testimony was clearly in the context of why Barrington

Plaintiff's assertion that the facts and circumstances surrounding Whitcomb's letter corroborate an improper motive of interference is not persuasive. First, Plaintiff underscores the fact that Whitcomb's letter just reiterates its "concern" regarding "potential disclosure" and asserts that Whitcomb did not have "concrete evidence" to justify sending the letter. (Plf's Resp., Dkt. # 47, at 13). In so doing, he points to the part of Whitcomb's letter regarding Plaintiff contacting "Philips RTAC," attempting to use his "RTAC Pin" to support "Universal Imaging in Dearborn, Michigan." Though Plaintiff disputes this -- he claims that this was not the case and that he was working somewhere else at this time -- he provides no record evidence for this assertion. And, even if he did, as

---

would never have entered into an employment agreement permitting dual employment:

> Q: Did [Plaintiff] tell you about [the] agreement [to work concurrently for Barrington and Philips]?
>
> A: No. And it's -- we would never do this. It's -- it's not industry standard. . . . We would never have agreed to that kind of dishonest dealings. It would have put us at risk with Phillips (sic). We just don't do business that way. You work for one company at a time. . . . [I] absolutely would not have agreed to have him work for two companies at once.

(Ex. D to Plf's Dep., Dkt. # 39-5, at 19-20). Plaintiff's reliance on this testimony is therefore immaterial.

16

discussed below, concern about potential disclosure is exactly the kind of legitimate business reason that insulates Defendant from liability.[11]

Second, Plaintiff raises timing issues with Whitcomb's letter. He emphasizes that he worked for Barrington for several months without Defendant expressing concern about its confidential information. (*Id.*). What he conveniently omits, however, is that he hid his employment with Barrington from Defendant, only to be discovered in July. That Whitcomb's letter came less than one month after his termination is of no consequence. Plaintiff has put forth no authority indicating that a one-month delay between terminating an employee and sending a letter confirming his obligations under an agreement to preserve confidential information evidences an improper motive. Nor can this Court second-guess Defendant's business judgment concerning when such communications should be sent. *Cf Hazle v. Ford Motor Co.*, 464 Mich. 456, 475-76 (2001) (courts cannot question whether an "employer is wise, shrewd, prudent, or competent;" rather,

---

[11] Plaintiff's Response also claims that Whitcomb submitted "false" statements in his affidavit supporting Defendant's Motion. Specifically, Plaintiff takes issue with Whitcomb's statement that he was involved in investigating Plaintiff's employment with Barrington before Defendant terminated Plaintiff. (Plf's Resp., Dkt. # 47, at 14-15). For support, Plaintiff relies upon his deposition testimony concerning who was present at the time Defendant terminated Plaintiff. This is a non-issue because Plaintiff has no evidence as to Whitcomb's role in an "investigation" -- as opposed to being present at the time of Plaintiff's termination. More importantly, whether there was an investigation or not bears no relevance to whether Whitcomb had an improper motive when sending the letter to Plaintiff and Barrington.

"[t]he only requirement is that, 'when evaluating its employees, employers are to evaluate them on the basis of their merits, in conjunction with the nature of their businesses at the time of the evaluation, and not on the basis of any discriminatory criterion'") (citation omitted); *Lee v. City of Columbus*, 636 F.3d 245, 258 (6th Cir. 2011) (courts may not "act as super personnel departments to second guess an employer's facially legitimate business decisions") (citation omitted).

Third, Plaintiff argues that Defendant "does not indicate that they made this kind of request" -- to confirm that he had not provided Defendant's confidential information to Barrington -- "for all employees." (Plf's Resp., Dkt. # 47, at 14). There is no record evidence regarding how Defendant treated other employees, let alone similarly situated employees and the Court declines to shift this burden to Defendant.

Notwithstanding this entire discussion, Defendant's actions cannot be improper because they were motivated by legitimate business reasons. "[U]nder Michigan law, preventing the anticompetitive use of confidential information is a legitimate business interest." *Rooyakker & Sitz, P.L.L.C. v. Plante & Moran, P.L.L.C.*, 276 Mich. App. 146, 158 (2007) (citation omitted). No reasonable juror would find that Whitcomb's letter -- even construed as a threat of litigation -- was improper because "[t]here is nothing illegal, unethical or fraudulent in filing a

18

lawsuit, whether groundless or not." *Dalley*, 287 Mich. App. at 324.[12] The Court finds that this is especially true in today's society where agreements to maintain an employer's information as confidential are part and parcel to many employment relationships. Indeed, even without these agreements, former employees are bound at common law from using a former employer's trade secrets or confidential information for his own benefit or to compete against that former employer. *Hayes-Albion Corp. v. Kuberski,* 421 Mich. 170, 180-81 (1985); *Follmer, Rudzewicz & Co., P.C. v. Kosco,* 420 Mich. 394, 404 (1984). It is not this Court's role to strip employers of the ability to enforce their right to prevent the disclosure of confidential information in instances similar to those presented here.

Accordingly, Defendant is entitled to Summary Judgment on Plaintiff's Complaint.

## C.     Defendant's Motion for Sanctions

Defendant's Motion for Sanctions, filed a day before Defendant's Motion for Summary Judgment, requests that this Court sanction Plaintiff and his attorney for their discovery conduct. It primarily requests that this Court dismiss Plaintiff's Complaint pursuant to Federal Rules of Civil Procedure 37(b) and 41(b). Because this Opinion and Order dismisses Plaintiff's Complaint on the merits, such a

---

[12] Because this Court determines that Plaintiff has failed to establish the elements of a claim for tortious interference with a business relationship, the Court declines to address Defendant's alternative argument that the *Noerr-Pennington* doctrine bars Plaintiff's claim.

request is therefore moot.  To the extent Defendant requests alternative relief, this Court is not persuaded that additional sanctions are necessary.

## IV. CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment (Dkt. # 41) is GRANTED and Plaintiff's Complaint is dismissed, with prejudice.

IT IS HEREBY FURTHER ORDERED that Defendant's Motion for Sanctions (Dkt. # 38) is DENIED.

IT IS HEREBY FURTHER ORDERED that Defendant's Emergency Motion for Leave to File Supplemental Reply Brief in Support of Motion for Sanctions (Dkt. # 57) is GRANTED.

**IT IS SO ORDERED.**


Dated:	January 21, 2014                    s/Gerald E. Rosen
                                              GERALD E. ROSEN
                                              CHIEF, U.S. DISTRICT COURT


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, January 21, 2014, by electronic and/or ordinary mail.

                                              s/Julie Owens
                                              Case Manager, 313-234-5135

20